Jack S. FOSTER, et al.

v.

The UNITED STATES.

No. 34–75.

United States Claims Court.

Oct. 20, 1983.

See also 2 Cl.Ct. 426.

Charles W. Willey, Santa Barbara, Cal., for plaintiffs. Richard L. Longpré, Santa Barbara, Cal., of counsel.

Gerald S. Fish, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

HARKINS, Judge.

Disposition of this taking case has been protracted. Substantial amounts of litigating time and effort have been expended by counsel and by the courts. Plaintiffs' petition (now complaint) was filed in the United States Court of Claims on February 7, 1975. There was a 10-day trial in January–February 1977 on both liability and quantum issues. The trial judge's opinion, filed on October 18, 1978, concluded that there had been a temporary taking, and that the

date of taking was November 18, 1971. In an opinion dated October 17, 1979,[1] the Court of Claims determined that plaintiffs' mineral rights had been permanently abrogated, and remanded the case to the trial division for ascertainment of plaintiffs' compensation. The parties were unable to stipulate the amount due to plaintiffs, and further evidentiary proceedings, over defendant's objection, were ordered. A second 10-day trial was held in January 1981.

On October 1, 1982, the case was transferred to the United States Claims Court by section 403(d) of the Federal Courts Improvement Act of 1982.[2] In an opinion filed April 7, 1983, plaintiffs' leasehold interest that was taken on November 18, 1971, was valued at $28,000[3] and counsel were given a briefing schedule with respect to plaintiffs' application for litigation expenses pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.[4] Final briefing on plaintiffs' application was completed August 25, 1983.

Plaintiffs have applied for a total reimbursement of $214,736.69. Defendant does not question its responsibility for plaintiffs' reasonable litigation expenses and is satisfied with the accuracy of plaintiffs' supporting documentation. Defendant objects, however, to $61,323.59, in attorney fees and costs, and to $10,173.45 in expert witnesses' fees and other expenses, on the ground that plaintiffs' request for an additional evidentiary proceeding was not reasonable and that the expenses incurred therein are ineligible as reasonable costs of litigation.

■ The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 requires the court rendering judgment for plaintiff in a taking case to allow as part of the judgment, an amount that will reimburse the plaintiff "for his reasonable costs, disbursements and expenses, including reasonable attorney, appraisal, and engineering fees actually incurred."

■ The statute requires: (1) judgment for plaintiff for a taking; (2) reasonable fees and expenses; and (3) fees and expenses that are actually incurred because of the proceeding. Plaintiffs have established that they are entitled to judgment and that the property taken had a value of $28,000. Plaintiffs' application for fees and expenses, with the supporting materials, establish that the amounts claimed were actually incurred because of this litigation, and in fact have been paid by plaintiffs.

The statute does not specify a standard to establish the limits of what are "reasonable" as fees and expenses. The United States Court of Claims, in taking cases where the judgment involved attorney fees and expenses under 42 U.S.C. § 4654(c), did not identify specific factors to be applied to give content to "reasonable" as used in the statute.[5] In its consideration of attorney fee allowances pursuant to the Indian Claims Commission Act,[6] the Court of Claims endorsed the standard that derived generally from the factors set forth in the American Bar Association Code of Profes-

---

1. *Foster v. United States,* 607 F.2d 943 (Ct.Cl. 1979) ("Foster I").

2. 28 U.S.C.A. § 171 note (1983).

3. *Foster v. United States,* 2 Cl.Ct. 426 (1983) ("Foster II").

4. 42 U.S.C. § 4654(c) (1976) provides:
   "(c) Claims against the United States
   "The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding."

5. *See e.g.: Pete v. United States,* 569 F.2d 565 (Ct.Cl.1978); *Emeny v. United States,* 526 F.2d 1121 (Ct.Cl.1975); *King v. United States,* 504 F.2d 1138 (Ct.Cl.1974); *Drakes Bay Land Co. v. United States,* 459 F.2d 504 (Ct.Cl.1972).

6. 25 U.S.C. § 70n (1976).

sional Responsibility, DR 2–106(B).[7] Courts in passing upon "reasonable" attorney fees authorized in other statutes generally have considered these factors, with minor variations in order and definition.[8]

█ The weight to be given to the respective factors varies with the requirements of the particular case. Of primary importance, however, is a consideration of the number of hours reasonably expended, and the hourly rate that is reasonable and customary in the community for the type of work involved.[9] In this case, in addition, emphasis is given to the complexity of the litigation, the rates the parties have agreed upon, the time that has been consumed between the initial taking and the award of compensation to plaintiffs, and the policies that underlie the decision of Congress to reimburse plaintiffs who ultimately are successful in taking cases.

Plaintiffs' application shows that fees were billed on a straight time basis, and that the rates changed over the period involved. Plaintiffs do not seek reimbursement on a "flat rate" basis, with the highest rate applied to the entire period. The following hourly rates were charged for work performed during the course of this litigation:

| TIME PERIOD | PRINCIPAL ATTORNEY | ASSOCIATE ATTORNEYS |
| --- | --- | --- |
| 1975 and part of 1976 | $65/hour | $30–$40/hour ** |
| latter 1976 and 1977 | $70/hour | $35/hour |
| 1978 | $75–$80/hour * | $35–$40/hour ** |
| most of 1979 | $80–$85/hour * | $40–$50/hour ** |
| latter 1979 and most of 1980 | $100/hour | $55/hour |

**7.** *Cherokee Nation v. United States,* 355 F.2d 945, 953–54 (Ct.Cl.1966). The following factors were listed as criteria generally considered in awarding compensation to attorneys:

"(1) The nature of the undertaking and the character of the services required.

"(2) The responsibility assumed.

"(3) The professional repute, standing, ability and experience of counsel.

"(4) The services rendered, including the time and labor required.

"(5) The magnitude and importance of the cases.

"(6) The novelty and difficulty of the questions involved.

"(7) The opposition encountered.

"(8) The results accomplished and the benefits flowing to the clients.

"(9) The professional competence displayed, including skill, industry, and diligence.

"(10) The fidelity of counsel to the interests of their clients.

"(11) The contingent nature of the employment and the hazards and risks involved.

"(12) The loss of income and opportunities for other employment due to employment of counsel in the litigation for which compensation is to be awarded.

"(13) Customary charges and going rates of attorneys for similar services. * * * "

**8.** In the determination of a reasonable attorney fee under Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000e–5(k)), the Fifth Circuit utilized a 12 point analysis with the following factors:

"... (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee in the community for similar work; (6) the fixed or contingent nature of the fee; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the resulted obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). *See also Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir. 1980); *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir.1975), *cert. denied sub nom. Perkins v. Screen Extras Guild, Inc.,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

**9.** In the District of Columbia Circuit, this is termed the "lodestar" formula. *Copeland v. Marshall,* 641 F.2d at 891.

| TIME PERIOD | PRINCIPAL ATTORNEY | ASSOCIATE ATTORNEYS |
|---|---|---|
| latter 1980 and most of 1981 | $115/hour | $65/hour |
| latter 1981 and most of 1982 | $120/hour | $75/hour |
| latter 1982 | $125/hour | $75/hour |
| 1983 thru March | $135/hour | |

\* rates shifted sliightly in mid-period;

\*\* rate differences reflect differences in experience of personnel

The hours expended by the principal attorney, associates, and law clerks/paralegals were as follows:

| YEAR | PRINCIPAL | H O U R S ASSOCIATES | LAW CLERK/PARALEGAL |
|---|---|---|---|
| 1975–77 * | 253.9 | 167.8 | 61.6 |
| 1977 | 243.8 | 291.2 | 0 |
| 1978 | 153.5 | 11.6 | 30.1 |
| 1979 | 110.8 | 140.3 | 0 |
| 1980 | 120.0 | 166.9 | 0 |
| 1981 | 226.5 | 232.6 | 0 |
| 1982 | 13.9 | 66.8 | 0 |
| 1983 ** | .5 | 0 | 0 |

\* thru March 31

\*\* to April 1, 1983

The total amount of attorney fees and expenses for which plaintiffs seek reimbursement is summarized as follows:

| C A T E G O R Y | T O T A L |
|---|---|
| Attorneys (includes costs of $10,601.51) | $ 161,619.06 |
| Appraisers | 25,563.50 |
| Engineers and Geologists | 15,551.43 |
| Reporters | 4,809.78 |
| Laboratories | 3,448.08 |
| Miscellaneous (includes travel, hotel, equipment, rentals, etc.) | 3,744.08 |
| | $214,736.69 |

According to defendant's estimates, this case required 3,281 man-hours of federal employees' time, exclusive of secretarial and other administrative support staff; of which 1,722 man-hours were from the Air Force and the Corps of Engineers, and 1,559 man-hours were by Department of Justice counsel. No official Air Force, and Corps of Engineers records were maintained for time devoted to this litigation. Hours shown for Department of Justice counsel are derived from records maintained since October 1, 1977, and from estimates.

The Government expended $39,426 in the employment of non-federal experts and consultants. Approximately 30 percent of defendant's federal man-hours, and $10,000 for experts and consultants is attributable to the second trial on damages. The payments to outside experts and consultants do not include all of defendant's costs for technical services. Professional assistance and laboratory facilities of the Corps of Engineers, and in-house technical experts of the

Air Force, were used before the taking date, and supplemented the outside experts' work during the litigation.

Plaintiffs have accounted for every reimbursable expenditure within the scope of the Act over the 9 years of the proceeding. The record includes copies of the invoices, a detailed statement of each item of legal work done, and payment checks (including the reverse sides of all litigation expense checks, to demonstrate they in fact were negotiated). Time records showing time expended by the principal attorney, the associate attorney, and support staff is shown for each year, with the number of hours charged at each rate. It is established on the record that the rates charged were consistent with the rates for comparable services that prevailed in Santa Barbara during the relevant periods.

The burden that plaintiffs have borne successfully in this litigation has been heavy. Plaintiffs were confronted with a succession of obstacles that were developed with great skill by able counsel and a battery of technical experts. Initially, defendant moved for summary judgment on the ground that plaintiffs were barred by the Anti-Assignment Act.[10] Defendant contended that if there had been a taking of any property interest, such taking had occurred before plaintiffs acquired any interest in the land. Plaintiffs' response caused defendant to acknowledge that there was a substantial question as to the applicability of the Act to the facts of this case and to move to withdraw its summary judgment motion. Defendant, after the first trial, however, reasserted its Anti-Assignment Act contention. After extensive briefing, this issue was resolved against defendant in *Foster I*.[11]

To secure compensation, plaintiffs were required to establish: (1) that dolomite was a mineral intended to be included in the reservation of mineral rights, (2) that the Government's denial of access to the deposits constituted a taking, and (3) that the deposits had a compensable commercial val-

ue. On all of these issues, defendant's opposition was adamant and vigorous. The mineralogical issues concerning a reservation of dolomite as a mineral, and the valuation of a mineral estate, involved technical complexities that produced a proliferation of expert witnesses. Plaintiffs' case included seven experts on geological and appraisal issues; defendant's opposition contained the advice of 12 experts on those issues. Counsel for each side had to be prepared with a working knowledge of geology and related scientific fields.

Throughout this litigation, the liability issues were closely related to the question of compensation, and the evidence developed and presented in support of the parties' positions was interwoven. The initial trial included both liability and compensation issues. The Court of Claims decision in *Foster I* determined only that plaintiffs' mineral rights had been abrogated. The valuation of plaintiffs' leasehold interest in the right to extract and remove dolomite from a specific site required application of complex mining and scientific technical information as well as knowledge about appraisal of a mineral estate.

■ The reimbursement provisions of 42 U.S.C. § 4654(c) were designed to supplement real property acquisition policies mandated by Congress. The purposes of these policies, among others, was to encourage and expedite the acquisition of real property by agreements with owners, and to avoid litigation and relieve congestion on the courts. Policies 7 and 8 of the Act provide:

(7) In no event shall the head of a Federal agency either advance the time of condemnation, or defer negotiations or condemnation and the deposit of funds in court for the use of the owner, or take any other action coercive in nature, in order to compel an agreement on the price to be paid for the property.

(8) If any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal

---

**10.** 31 U.S.C. § 203 (1976).

**11.** *Foster v. United States,* 607 F.2d at 947, n. 6.

agency concerned shall institute formal condemnation proceedings. No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property.

Defendant acknowledges that plaintiffs are entitled, under the Act, to $143,239.65 as compensation for fees and expenses actually incurred because of this taking case. Defendant objects, however, to compensation for attorney fees and expenses related to the preparation for, and conduct of, the second trial on the issues of damages. Initially, defendant argued that an expenditure of $214,736.69 to secure an award of compensation of $28,000 plainly was unreasonable, and that plaintiffs should not be reimbursed for any expenses incurred after the Court of Claims rendered its decision on October 17, 1979. Subsequently, defendant became satisfied that the October 17, 1979, cutoff date was not appropriate because the decision necessarily left something further to be done and that some expenses incurred by plaintiffs after that date were reasonable. Defendant's revised objection was to compensation for payments to expert witnesses and for other expenses that total $10,173.45, and for payments of attorney fees and costs that total $61,323.59. Defendant's revised objection to plaintiffs' expenditures deemed unreasonable centers upon attorney fees and costs shown on statements submitted by plaintiffs on and after July 10, 1980, and expenses for expert witnesses shown on statements on or after July 3, 1980.

The problem in this case is one which, in the normal course, assessment by the parties of their respective positions should have produced a settlement at an early stage before litigation was needed. Settlement prior to the initiation of litigation was hampered because of plaintiffs' exaggerated concept of the value of the property involved, and defendant's failure to appreciate the exposure implicit in a mineral reservation that was held over from a hurried acquisition in October 1941. On April 12, 1974, plaintiffs asserted a claim to the Director of Real Estate, Washington Office of the Chief of Engineers, of "$18,750,000, based on a probable extractable deposit of 25,000,000 tons, valued on a royalty basis 'in-place' at 75¢ a ton." Although defendant recognized that the property was subject to a mineral reservation, it persisted in its concept that dolomite rock was not intended to be included in the mineral reservation. This case followed, and defendant's position subsequently was found to be erroneous.

On May 6, 1980, after the remand for ascertainment of plaintiffs' damages, a pretrial conference was held to clarify the status of the negotiations for a settlement and to determine if further proceedings would be required. The conference memorandum contains the following paragraphs:

2. Efforts by counsel to reach a settlement on the amount plaintiffs could recover were discussed. Counsel were instructed to explore further the possibility of settlement and to reexamine their respective positions in the light of reasonable expectations in the event the case proceeded to final determination by the court.

3. It was pointed out that the October 18, 1978, opinion set forth the trial judge's analysis of plaintiff's entitlement to recovery on the basis of the record as it currently stands, namely that plaintiffs have not shown that any knowledgeable purchaser would have been willing to pay more than $23,250 for the right to extract dolomite from the Tract 83 deposits. Defendant's concession of that amount was accepted in the absence of any more definitive measure acceptable under legal and accounting principles. Further, evidence presented by plaintiff at trial was not persuasive, and its computation of the operator's intent was characterized as "blue sky speculation." Counsel were advised that the reasoning that applied on this record to a valuation of a temporary taking logically could be applied to valuation of a permanent taking, and that the trial judge was prepared to accept $23,250 as the amount to be recovered if counsel wanted to go forward on the ba-

sis of the record as it now stands. Plaintiffs were advised that the materials submitted pursuant to the January 7, 1980, order appeared to be subject to infirmities similar to that in evidence previously adduced and to contain assumptions that would be vulnerable under cross-examination. Plaintiffs stated the evidence intended to be adduced is probative and noncumulative and that counsel preferred to reopen the record, rather than go forward on a valuation of $23,250 established in the present record.

4. There was discussion of the Government's exposure to future litigation. The Government's assembly of land for Camp Cooke subject to a reservation of mineral rights in the vendors exposes defendant to risks in the future from plaintiffs with respect to Tract 83 as well as from other holders of mineral reservations.

Defendant's objection to expenses shown on the statement of July 10, 1980, runs to charges for attorney services rendered in June 1980, in the amount of $4,408.13. In the light of the court's direction at the May 6, 1980, conference for counsel to reexamine their respective positions, expenditures through June 1980 reasonably may be related to the collection of information that would have bearing upon reconsideration of plaintiffs' position and a renewal of settlement negotiations. Accordingly, plaintiffs' expenditures during June 1980, for attorney services, as reflected on the July 10, 1980, statement are deducted from "expenses due to or arising from the conduct of the second trial" to which defendant objects. The expenditures incurred after July 1, 1980, as shown on the August 19, 1980, statement are allocable to the expenses of the second trial. Accordingly, $4,408.13 is deducted from defendant's list of challenged attorney

fees and costs, and the total is reduced to $56,915.46.

A further adjustment is made to the total of $56,915.46 for attorney fees and costs to which defendant objects. The failure of the parties to settle this problem, either without litigation, or at least after the question of liability was determined in the October 17, 1979, Court of Claims decision, is the responsibility of both parties. Defendant should bear an equal share. Accordingly, the amount to which defendant objects is divided equally, and $28,457.73 is deducted from plaintiffs' total claim.

Defendant's objection to $10,173.45 for expert witnesses and other expenses is logically consistent with defendant's purpose to deny reimbursement for expenses due to or arising from the conduct of the second trial. These expenses were necessary to supplement plaintiffs' theory of damages. The information provided by these experts was utilized at the second trial, and was useful in the April 7, 1983, decision. Accordingly, reimbursement is allowed for these charges.

Plaintiffs are entitled to recover as just compensation $28,000 plus interest, and the sum of $186,278.96 for reasonable costs, disbursements, and expenses.

In order to produce the full value of the property taken, just compensation includes interest. Interest is to be computed at simple interest rates from the time of taking to the date of payment.[12] The Court of Claims established 7.5 percent as the appropriate rate for the period 1971–75; 8.5 percent as the appropriate rate for the period 1976–79. A rate of 12 percent has been found to be appropriate for the period 1980–82.[13] In the April 7, 1983, opinion, interest to be paid on the mineral rights taken for years after 1981 was to be computed on the average yield on Aaa bonds in Moody's Composite Index on Corporate Bonds.[14]

---

12. *Albrecht v. United States,* 329 U.S. 599, 604, 67 S.Ct. 606, 609, 91 L.Ed. 532 (1947); *Miller v. United States,* 620 F.2d 812 (Ct.Cl.1980).

13. *Miller v. United States,* 620 F.2d at 840; *Georgia Pacific Corp. v. United States,* 640 F.2d 328, 367 (Ct.Cl.1980); *Berenholz v. United States,* 1 Cl.Ct. 620 (1982).

14. *Foster v. United States,* 2 Cl.Ct. at 456. ("Foster II"). The average yield on Aaa Corporate Bonds for 1981, was stated, in error, to be 15.06 percent, and, for the 6 month period January-June 1982, it was stated, in error, to be 15.71 percent. The average yield on Aaa Corporate Bonds for 1981 was 14.17 percent; for

■ The Contract Disputes Act requires interest on contract claims allowed under the Act to be paid at the rate established by the Secretary of the Treasury pursuant to Pub.L. No. 92–41 (85 Stat. 97).[15] This method of establishing interest rates has the approval of Congress, and this court requires such rates to be paid on contract claims. Little justification is seen for utilization of another method to establish the rate that is to be included in just compensation in a taking case. Rates established under the Contract Disputes Act procedure for the following periods are:

| Period | Rate |
| --- | --- |
| Jan. – June 1980 | 12¼ percent |
| July – Dec. 1980 | 10½ percent |
| Jan. – June 1981 | 14⅝ percent |
| July – Dec. 1981 | 14⅞ percent |
| Jan. – June 1982 | 14¾ percent |
| July – Dec. 1982 | 15½ percent |
| Jan. – June 1983 | 11¼ percent |
| July – Dec. 1983 | 11½ percent |

For purposes of uniformity in compensation of claims against the Government, flexibility in administration, notice to the public, and judicial efficiency, rates established under the method required in the Contract Disputes Act are determined to be appropriate for computation of just compensation in this taking case for the period commencing January 1, 1980.[16]

### CONCLUSION

On condition that plaintiffs execute a quit claim deed relative to any right to extract dolomite from the two identified deposits on Tract 83 and deliver same to defendant, judgment shall be entered for plaintiffs in the amount of twenty-eight thousand dollars ($28,000), with just compensation to include interest on that amount at the rate of 7.5 percent per annum from November 18, 1971, through December 31, 1975; 8.5 percent per annum from January 1, 1976, through December 31, 1979; and from January 1, 1980, to the date of payment at the rate established by the Secretary of the Treasury pursuant to Pub.L. No. 92–41 (85 Stat. 97) for the Renegotiation Board. In addition, the judgment shall include one hundred eighty-six thousand two hundred seventy-eight dollars and ninety-six cents ($186,278.96) as compensation for reasonable costs, disbursements and expenses.

1982, it was 13.79 percent; and for the first 4 months of 1983, it was 11.76 percent.

**15.** 41 U.S.C. § 611 (Supp. V 1981).

**16.** *See Jones v. United States,* 3 Cl.Ct. 4 (1983).