NRG COMPANY, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 671–86L, 672–86L.

United States Court of Federal Claims.

Feb. 22, 1994.

Sidney R. Thomas and William H. Bellingham, Billings, Montana, for plaintiffs.

Thornton Withers Field, Washington, D.C., for defendant. Karl Kiehn, Office of the Solicitor, United States Department of the Interior, of counsel.

## OPINION

ANDEWELT, Judge.

### I.

In these consolidated actions, plaintiffs, NRG Company, Mike T. Gustafson, William H. Lang, Bellford & Co., Cormorant Corp., Wesco Resources, Inc., and Thermal Energy, Inc., seek payments from the United States for damages they allegedly suffered as a result of the enactment of federal legislation that prompted the cancellation of three mineral prospecting permits owned by plaintiffs. The permits in issue covered land on the Northern Cheyenne Indian Reservation in Montana. During trial, plaintiffs alleged that the legislation that cancelled their permits constituted a taking of plaintiffs' property for which plaintiffs are entitled to just compensation under the Fifth Amendment to the Constitution. For the reasons set forth herein and in this court's prior opinion granting plaintiffs' motion for summary judgment as to liability, *NRG Co. v. United States,* 24 Cl.Ct. 51 (1991) (*NRG I*), the court agrees that the legislation cancelling the permits constitutes a Fifth Amendment taking and that plaintiffs are entitled to compensation. The court concludes that the appropriate amount of compensation due plaintiffs as of the date of permit cancellation is equal to the total amount plaintiffs had previously paid to both the Department of the Interior's Bureau

of Indian Affairs (BIA) and the Northern Cheyenne Indian Tribe (the Tribe) to secure and renew their permits.

## II.

The background facts underlying plaintiffs' claims are set forth in detail in *NRG I* and will not be repeated in total herein. Between 1969 and 1971, the Tribe, with the approval of the BIA, granted a number of permits that allowed the prospecting for coal on certain areas of the Tribe's reservation land. The three permits in issue here each granted the "exclusive right [to prospect] for a period of 2 years, with the right to a single 2-year renewal." The permit holders also had the option during the term of the permits to obtain leases to mine coal at a fixed price per ton on portions of the permitted land. In June 1973, plaintiffs tendered payments for a two-year renewal of their permits.

The Tribe originally promoted the sale of mining permits for over half of its reservation land. The Tribe later became convinced, however, that it had been treated unfairly in the solicitation and bidding process and that large-scale mining on its reservation land would be too disruptive of reservation life. Based on its change of position, the Tribe committed itself to voiding all of the permits and leases it previously had granted on its reservation land. In furtherance of this goal, the Tribe, *inter alia*, petitioned the Secretary of the Interior (the Secretary) to void these permits, and, in contravention of the permit requirements, refused to allow the permittees to continue coal prospecting on the permitted land. In response to this mounting dispute, on June 4, 1974, the Secretary suspended all activity under the permits and leases. The Secretary indicated that there would be no further action on lease applications until the permit and lease owners reached an agreement with the Tribe. In the years following, certain permit holders, including plaintiffs, contacted the Tribe and asked for the right to continue performance under the permits. The Tribe, however, remained steadfast in its position that the permits must be voided and that there should be no large-scale mining on its reservation land.

While the Tribe sought to void all permits and leases it previously had granted, it viewed plaintiffs' permits with particular hostility. The Tribe had come to the conclusion that plaintiffs had used unscrupulous bidding tactics in order to secure the permits at an improperly low price.[1] In addition, the Tribe viewed plaintiffs as speculators who never intended to develop the reservation land for their own use but rather simply sought to turn a quick profit on the resale of mineral rights that they purchased from the Tribe for relatively low sums.

## III.

The disputes between the Tribe and the various permit and lease holders ultimately became the focus of congressional legislation. In the Act of October 9, 1980, Pub.L. No. 96–401, 94 Stat. 1701 (1980) (the Cancellation Act), Congress provided for the ultimate cancellation of all of the exploration permits and any resulting leases on the Tribe's reservation land. The Cancellation Act opens with Congress listing five findings which explain its rationale for enacting legislation to cancel the permits and leases:

1. The bidding process raises certain unanswered questions. The BIA accepted sealed bids and when it received more than one bid, it then conducted an oral auction among those who submitted the bids. After it determined the highest bidder, the BIA then made a second determination as to whether the highest bid was high enough to warrant award of a permit. Plaintiffs had joined together to place a single bid on certain tracts of reservation land. For certain other tracts, however, plaintiffs presented more than one sealed bid, under different names. Because all entities that submitted sealed bids were allowed to participate in oral auction, the question arises as to why plaintiffs would have presented more than one bid on certain tracts, *i.e.*, why plaintiffs would have bid against themselves. One possibility is that plaintiffs wanted it to appear to the BIA as though there was more bidding competition than there actually was. Such a misimpression could have increased the likelihood of an award to plaintiffs if plaintiffs submitted the high bid because the BIA could have concluded that the ultimate high bid was the result of vigorous competition. While the BIA apparently conducted some investigation in response to the Tribe's complaints in this regard and concluded that there was no improper collusive bidding, the record in this litigation does not contain an adequate explanation as to why plaintiffs bid as they did.

(1) certain mineral leases and prospecting permits entered into between the Northern Cheyenne Tribal Council and private parties in 1969, 1970, and 1971, presently encumber approximately 56 per centum of the lands within the boundaries of the Northern Cheyenne Indian Reservation;

(2) due to the likelihood of permanent and large-scale physical and social disruption of their tribal community that would result from development under such leases and permits, the Northern Cheyenne Indian Tribe has been and continues to be opposed to any development under these leases and permits;

(3) although such leases and permits were approved by representatives of the Secretary of the Interior, there are serious questions whether such approval is lawful and consistent with the trust responsibility of the Secretary of the Interior to "act in the best interests" of Indian tribes and individuals;

(4) the present impasse with regard to such leases and permits, unless resolved, can only result in expensive and time-consuming litigation that does not hold out the likelihood of a satisfactory solution that would be fair to all parties; and

(5) cancellation of such leases and permits, and providing a fair remedy to any party or parties whose property interest, invested in good faith, would be adversely affected by such cancellation, appears to be the most direct and effective manner within which to resolve this impasse.

Section 2 of the Cancellation Act directed the Secretary to seek to negotiate permit and lease cancellation agreements that were acceptable to both the permit and lease holders and the Tribe. To encourage the permit and lease holders to enter such agreements, Section 3(a)(1) of the Cancellation Act authorized the Secretary to offer the permit and lease holders rights to mine federally owned coal deposits located outside of the Tribe's reservation. The Cancellation Act provided a time period within which the permit and lease holders could enter such cancellation agreements. With respect specifically to plaintiffs' permits, Section 4(b) of the Cancellation Act provided that if the parties did not enter a voluntary cancellation agreement by January 1, 1982, the permits would be cancelled by act of law. In anticipation of possible litigation arising with respect to such permit cancellations, Section 4(c) of the Cancellation Act specifically provided that this court would have jurisdiction to render judgment on any claim against the United States "arising out of such cancellation."

The Secretary executed cancellation agreements covering all of the permits and leases, including the three permits in issue here. But, as explained above, not only did the permit and lease holders have to agree to the terms of such agreements, but also the Tribe had to give its approval. Seizing on the opportunity Congress provided it, the Tribe insisted that the permit and lease holders make significant payments to the Tribe in exchange for the Tribe's approval of the agreements.[2] The Tribe reached agreements with all of the permit and lease holders except plaintiffs and received millions of dollars in payments for its acquiescence to the cancellation agreements. Plaintiffs negotiated with the Tribe as to appropriate compensation but ultimately failed to secure the Tribe's approval of the cancellation agreements within the statutory time period. As a result, on January 1, 1982, plaintiffs' permits were cancelled pursuant to the provisions of the Cancellation Act.

### IV.

In *NRG I*, 24 Cl.Ct. 51, this court analyzed the underlying facts in the context of control-

---

**2.** It is not apparent why Congress gave the Tribe veto power over a decision by the Secretary to enter cancellation agreements that exchanged prospecting and mining rights on the Tribe's reservation land for federal coal rights on land located outside of the reservation. The Tribe had requested that the BIA void the permits and leases, and the BIA's successful negotiation of cancellation agreements would give the Tribe all of the relief for which it had asked. By granting the Tribe veto power, Congress apparently permitted the Tribe to "sell" its acquiescence to the permit holders for millions of dollars. Thus, Congress decided to "solve" a dispute between the Tribe and the permit holders by giving the permit holders coal rights on federal land, which was owned by all citizens of the United States, and by permitting the Tribe, in effect, to charge for these rights.

ling Fifth Amendment takings precedent and concluded that the Cancellation Act operated as a fifth amendment taking of private property. The decision as drafted left open only the issue of damages. In the course of that opinion, the court reviewed and applied the factual predicates for a Fifth Amendment takings analysis. *Inter alia,* the court analyzed the character and economic impact of the governmental action, and the extent to which that action interfered with plaintiffs' reasonable investment-backed expectations. *See also Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

Defendant filed a motion for reconsideration of *NRG I.* Defendant contended that based in part on an off-the-record status conference conducted after the completion of briefing and oral argument on summary judgment, defendant was of the understanding that it would have an opportunity to present additional evidence on the issue of plaintiffs' reasonable investment-backed expectations after the court issued its decision on summary judgment. The court did not recall making any statements during that status conference that arguably could convey such an impression. But, because of defendant's representations as to its understanding, and because the issues of quantum of damages and reasonable investment-backed expectations are intertwined and would require essentially the same witnesses at trial, the court agreed to reopen the issue of investment-backed expectations and allow the parties to present evidence on that issue at trial.

### V.

During trial, plaintiffs contended that the cancellation of their permits interfered with their reasonable investment-backed expectations because plaintiffs had entered a binding contract with the Tribe and reasonably expected that they would secure economic benefits from that contract. Plaintiffs further

contended that the proper measure of the value of the permits at the time of cancellation was the value that plaintiffs would have received from full contract performance, *i.e.,* the value of the mineral rights plaintiffs would have received had plaintiffs been allowed to proceed with the development of working mines on the permitted reservation land. Plaintiffs offered a mine valuation expert who placed a monetary value on these mineral rights.

In a typical contract case, plaintiffs would be correct that a party to a private contract reasonably could expect the other party to comply with the provisions of the contract and that the economic loss that a party suffers when Congress enacts legislation cancelling the contract would be the net value of full contract performance. Such is true because in a typical contract case, absent cancellation, a party to a private contract could anticipate achieving the value inherent in contract performance, either through securing actual performance or, if the other party failed to comply with the provisions of the contract, through instituting suit and securing breach of contract damages.

But the instant case is not a typical contract case because one of the parties to the instant permit agreements is a United States Indian tribe. Indian tribes, like the United States itself, possess sovereign immunity and, in the absence of congressional authorization, cannot be sued in court without the Tribe's consent. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). *See also Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 509–10, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991); *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Herein, Congress has not authorized suit against the Tribe for failure to fulfill its contractual obligations in the permits. Thus, a party may not sue the Tribe unless the Tribe authorizes such a suit.[3] As

---

3. Plaintiffs cite *Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes,* 623 F.2d 682 (10th Cir.1980), *cert. denied,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981), for the proposition that an Indian tribe does not possess sovereign immunity

where the tribe interferes with the property rights of individuals who are not members of the tribe. But *Dry Creek* is an anomaly and, as the dissent therein notes, it is inconsistent with Supreme Court dictates on tribal sovereign immu-

to the instant permits, the Tribe has never issued a blanket waiver of sovereign immunity for contracts it enters with nontribe members, and has never specifically waived sovereign immunity with respect to the instant permits. Therefore, unlike parties to a typical private contract, plaintiffs herein, although they secured a signed contract, were without a forum in which to enforce that contract.

Lack of an enforcement mechanism is significant when placing a value on the permits at the time they were cancelled by federal law because, as explained above, prior to cancellation, the Tribe, in effect, had repudiated the permits and made clear its determination not to allow plaintiffs to mine on its reservation land. Faced with this opposition from the Tribe, and without a forum in which to secure either contract performance or damages, plaintiffs reasonably could not have expected at the time of permit cancellation that they would be able to secure the economic benefits that would have resulted from full contract performance.[4]

Indeed, Jase O. Norsworthy, president of plaintiff NRG Company (NRG), openly admitted at trial that the Tribe's antagonism had seriously eroded the value of plaintiffs' permits. Norsworthy testified that NRG had sought in 1976 to sell its rights under the permits but was stymied by the Tribe's actions and was thus unsuccessful. Given the "Indian problem," Norsworthy explained, plaintiffs simply did not have anything that was "very salable." In the context of the Tribe's position, Norsworthy analogized the permit rights to a "crippled horse." When asked what monetary expectations plaintiffs had with respect to their permits after the unsuccessful attempt to sell in 1976, Norsworthy answered: "I would say the only thing that was a probably pretty strong expectation was that we were going to get the escrowed funds back. Somehow, someway, sometime."[5] (The BIA had placed in escrow the funds tendered by plaintiffs in 1973 for renewal of their permits.)

Norsworthy testified in effect that the adoption of the Cancellation Act in 1980 served to change plaintiffs' grim economic expectations with respect to the permits because the Cancellation Act provided a process, which previously did not exist, by which the permit holders could move forward. The terms of that process, however, were carefully delineated in the Cancellation Act. Plaintiffs had a short window of time during which they could agree to exchange their permits

---

nity. In *Santa Clara*, 436 U.S. at 58–59, 98 S.Ct. at 1677, the Supreme Court explained:

> Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. *Turner v. United States*, 248 U.S. 354, 358 [39 S.Ct. 109, 110, 63 L.Ed. 291] (1919); *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512–13 [60 S.Ct. 653, 656, 84 L.Ed. 894] (1940); *Puyallup Tribe v. Washington Dept. of Game*, 433 U.S. 165, 172–173 [97 S.Ct. 2616, 2621, 53 L.Ed.2d 667] (1977). This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But "without congressional authorization," the "Indian Nations are exempt from suit." *United States v. United States Fidelity & Guaranty Co., supra,* [309 U.S.] at 512 [60 S.Ct. at 656].

> It is settled that a waiver of sovereign immunity " 'cannot be implied but must be unequivocally expressed.' " *United States v. Testan*, 424 U.S. 392, 399 [96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976), quoting, *United States v. King*, 395 U.S. 1, 4 [89 S.Ct. 1501, 1503, 23 L.Ed.2d 52] (1969).

4. In *NRG I*, 24 Cl.Ct. at 62, commenting on the evidence that had accompanied the parties' summary judgment motions, this court stated that "[u]nlike in *United Nuclear [Corp. v. United States]*, 17 Cl.Ct. 768 [(1989)], there is no reason to presume that the Cheyenne Tribe would have involved sovereign immunity in an effort to avoid obligations to which the Tribe willingly consented in a formal agreement." At trial, however, plaintiffs presented testimony from counsel who had represented the Tribe which established that the Tribe was adamant about precluding large-scale mining on its reservation land and would have asserted sovereign immunity to prevent plaintiffs from such mining. Indeed, the Tribe intentionally sought a nonjudicial, rather than judicial, means to clear title to its reservation land in order to preserve its right and ability to assert sovereign immunity.

5. Indeed, when the Tribe determined to seek congressional help to obtain cancellation of the permits, the Tribe requested contributions from the permit holders to support this legislative effort. Four of the permit holders gave $15,000 each. Plaintiffs apparently thought the permits were of sufficiently little value that they refused to make any contribution.

either for coal leases on federally owned land or for bidding rights on future federal coal sales. If plaintiffs did not reach the required agreements within that window of opportunity, the permits would be cancelled.

■ Thus, Norsworthy was correct that the Cancellation Act increased the expected value of the permits during that short window of time by providing the permit holders with a process by which they could turn the permits into potentially valuable federal coal rights. But plaintiffs failed to take advantage of this process within the allowed time frame. As a result, at the moment cancellation occurred pursuant to the Cancellation Act, plaintiffs were in essentially the same position they had been prior to enactment of the Cancellation Act. The Tribe had refused to honor the terms of the permits and plaintiffs were without a forum in which to force the Tribe to honor them. In this factual setting, the value of the permits taken from plaintiffs can hardly be measured by the value of full contract performance. Under the just compensation clause, "[t]he owner [of private property] is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973). At the time of permit cancellation, plaintiffs had no reasonable expectation of securing full contract performance or the value to them of such performance.

## VI.

■ Defendant seizes on the Tribe's repudiation of the permits prior to cancellation and argues that in view of this repudiation, plaintiffs could not have had any reasonable investment-backed expectations with respect to the permits at the time of cancellation. Hence, defendant argues, the cancellation of the permits could not constitute a taking of property by the United States in contravention of the Fifth Amendment. In a related argument, defendant contends that even if technically a taking had occurred, given the Tribe's prior repudiation of the permits, plaintiffs did not suffer any monetary damage as a direct result of the Cancellation Act.

But these arguments must fail because such arguments do not recognize the significant leverage that plaintiffs possessed vis-a-vis the Tribe as a result of the permits.

While plaintiffs were without a forum in which affirmatively to enforce their permit rights, the Tribe nevertheless was concerned that the outstanding permit agreements had created a cloud over the Tribe's otherwise undisputed title to its reservation land. This cloud was alluded to in Congress' finding in the beginning of the Cancellation Act that leases and permits "presently *encumber* 56 per centum of the lands within the boundaries of the Northern Cheyenne Indian Reservation" (emphasis added). The Tribe was sufficiently concerned about this cloud that it initiated the legislative effort, which ultimately was successful, to have Congress enact legislation cancelling all permits and leases on reservation land.

Based on all the testimony and evidence submitted at trial, the court concludes that had the United States not acquiesced in the Tribe's effort to cancel all permits, the Tribe would have been willing to negotiate with plaintiffs and offer consideration in exchange for cancellation of the permits and the resultant removal of the cloud over the Tribe's title to its reservation land. Moreover, the evidence indicates that as of January 1, 1982, the date of permit cancellation, plaintiffs believed that the permits had a significant value, albeit less than the value of full contract performance. In this context, the court concludes that plaintiffs had a reasonable investment-backed expectation that they ultimately would secure monetary payments in exchange for cancellation of the permits. Given plaintiffs' expectation in this regard, for the reasons explained in *NRG I,* the cancellation of the permits constituted a taking of private property for public use under the Fifth Amendment and plaintiffs are entitled to compensation.

## VII.

■ Because the federal government has engaged in a Fifth Amendment taking, the court, as relief, must "put [plaintiffs] in the same position monetarily as [they] would have occupied if [their] property had not

been taken." *Almota Farmers*, 409 U.S. at 473–74, 93 S.Ct. at 794. Thus, the court must grant plaintiffs an award equal to the monetary value of the permits at the time the permits were cancelled. Assessing such a value requires a prediction as to the outcome of the negotiations concerning cancellation of the permits that would have occurred between plaintiffs and the Tribe had the government never intervened. While predicting the outcome of hypothetical negotiations necessarily involves some degree of speculation, fairly compelling evidence exists here as to the likely outcome of such negotiations. In the end, the parties would have agreed that plaintiffs would have exchanged their permits for a refund of all payments previously made to both the Tribe and the BIA with respect to the permits, including payments made directly to the Tribe and payments that at the time were being held by the BIA in escrow.[6]

The trial evidence indicates that the Tribe would have acquiesced to such an agreement. Throughout the period prior to cancellation, the Tribe consistently had taken the position that the permits were void at their inception. Therefore, a return of all funds paid for and pursuant to the permits would be entirely consistent with the Tribe's position. Moreover, the Tribe would not have been willing to pay plaintiffs any greater consideration because the Tribe was hostile toward plaintiffs and believed, in effect, that plaintiffs had acted in bad faith toward the Tribe. Any greater consideration would have resulted in plaintiffs receiving a net benefit from the permit process and in the Tribe paying out more than it had received. The Tribe believed it had been wronged and the court concludes that the Tribe would not have been willing to suffer a real financial loss or to pay any such tribute to plaintiffs in order to remove the cloud on reservation title.

As to plaintiffs, it would seem that plaintiffs also ultimately would have agreed to exchange their permits in return for all previous payments they had made directly to the Tribe and to the BIA for the Tribe. "[A] crippled horse" is not worth much regardless of the horse's potential before its crippling injury. Moreover, prior to the Cancellation Act, plaintiffs apparently viewed such an outcome as generally likely. As explained above, Norsworthy indicated that after plaintiffs unsuccessfully attempted to sell the permits in 1976, plaintiffs' only strong expectation was that they would "get the escrowed funds back." In addition, if plaintiffs could not get any greater consideration from the Tribe, their only option would be to find a third party purchaser. But in view of the Tribe's adamant refusal to permit large-scale mining on its reservation land, a refusal that has in fact continued to this day, it is not reasonable to expect that plaintiffs would have been able to sell the permits to a third party at a price higher than the total amount of plaintiffs' previous permit payments.[7]

Thus, the court concludes that just compensation for the taking of plaintiffs' permits through the Cancellation Act is the total amount plaintiffs originally paid to the Tribe for the permits plus any additional payments plaintiffs made to the Tribe and the BIA under the terms of the permits. The Tribe would have been willing to pay that amount and plaintiffs, unable to receive any greater amount in an open market sale of the permits, would have agreed to accept it. Pay-

6. As noted above, plaintiffs had tendered payments to the BIA as required under the permits for a two-year renewal of their permits. Because the Tribe previously had expressed its position that the permits were void, the Tribe refused to accept the payments and the BIA held those payments in escrow. Five years *after* cancellation of the permits, when there was no longer any cloud over the Tribe's title to its reservation land, the Tribe accepted the escrowed funds on the theory that by depositing those funds, plaintiffs had preserved their right under the permits to apply for mining leases, a right that subsequently had been cancelled by the Cancellation Act.

7. The agreements that certain plaintiffs entered with Wesco Resources, Inc. (Wesco) and Thermal Energy, Inc. (Thermal), who subsequently were joined as plaintiffs in this action, do not suggest that a third party would have paid more. Wesco and Thermal agreed to pay substantial sums to plaintiffs on the condition, *inter alia,* that Wesco and Thermal were able to reach a financially satisfactory cancellation agreement granting Wesco and Thermal coal leases on federal land. Wesco and Thermal, however, were not able to negotiate such agreements within the window of opportunity provided in the Cancellation Act.

ment of this amount by defendant, therefore, would "put [plaintiffs] in the same position monetarily as [they] would have occupied if [their] property had not been taken." *Almota Farmers,* 409 U.S. at 473–74, 93 S.Ct. at 794.

## VIII.

Plaintiffs make several arguments to support their position that a return of plaintiffs' payments is not the appropriate measure of damages and that instead the court should base damages on the value of full contract performance. But none of plaintiffs' arguments is convincing.[8]

Plaintiffs initially point to Congress' findings at the beginning of the Cancellation Act which state that the Cancellation Act provides a "fair remedy" to parties whose property interests would be adversely affected by cancellation of the permits and leases. Plaintiffs then contend that herein the only "fair remedy" is to give plaintiffs the reward they originally had bargained for—the value of the mineral rights covered by the permits. But this conclusion does not follow.

The Fifth Amendment proscribes the taking of private property for public use without just compensation. The traditional remedy for a Fifth Amendment taking, *i.e.,* the amount traditionally deemed "just compensa-

tion," is the value of the property at the time the government takes the property. *Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1580 (Fed.Cir.1990); *see also, United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). Such relief is deemed "just" because it makes the plaintiffs "whole" in that it puts them in the same financial position they would have been had the government never taken their property. *Almota Farmers,* 409 U.S. at 473–74, 93 S.Ct. at 794. Herein, as explained above, when cancelled by federal law, the permits had significant value, albeit diminished by the Tribe's uncompromising position. The court finds nothing unjust, unfair, or contrary to the policy of the Cancellation Act in granting plaintiffs an award equal to this value and thereby applying traditional Fifth Amendment procedures for calculating takings damages.[9]

Next, plaintiffs contend that even assuming the Tribe could exercise sovereign immunity, damages still should be calculated based upon the value to plaintiffs of full contract performance.[10] Plaintiffs argue that their inability to sue the Tribe would not be significant because (1) the BIA rather than the Tribe exercised the pertinent authority under the permits and was obliged to issue the leases, and (2) the Cancellation Act anticipat-

---

**8.** Because the court concludes that full contract performance is not an appropriate measure for compensation herein, the court will not analyze the comprehensive reports and testimony of the parties' experts to determine the precise value to plaintiffs of full contract performance. Plaintiffs' valuation expert testified at trial that the permit land had a total value of $5,624,000. Defendant's valuation expert testified that the land could not be economically mined and thus had a negative value as a mine site. Upon initial analysis, the court concludes that plaintiffs' estimates overstate to a significant degree the value of the mineral rights involved. The court, however, has not analyzed the reports and testimony in sufficient detail to determine whether the mining leases that could have been secured pursuant to the permits would have had a positive value. If the mines did not have a positive value and the court were to adopt plaintiffs' proposed measure of damages, the compensation due plaintiffs would be zero.

**9.** There is nothing in the Cancellation Act that indicates that Congress intended to go beyond traditionally available remedies for a Fifth

Amendment taking. Indeed, Section 5(b) of the Cancellation Act provides that "nothing in this Act shall establish or extinguish any claim or liability that may arise in connection with such lease, permit, or right to a lease so canceled." This disclaimer of an intent to create any new liability would seem to indicate that Congress did not intend to mandate liability different from that which would result from established measures for calculating damages for the taking of property.

**10.** To support the use of the value of full contract performance as the measure of damages, plaintiffs stress that at trial neither party's expert diminished his valuation of the permits based upon the uncertainty in dealing with the Tribe. But the parties' experts were mine valuation experts, not legal experts. They simply determined the value of the mines that plaintiffs could have operated had the Tribe permitted the issuance of mining leases. The experts did not present any legal or economic analysis concerning the Tribe's ability to claim sovereign immunity and the likelihood of plaintiffs being able to secure a lease to mine over the Tribe's objection.

ed suits against the United States and not against the Tribe. But this argument misunderstands both the respective responsibilities of the BIA and the Tribe in the permit and lease process and the differences between a refusal to issue a lease and the cancellation of the permits.

First, the permits were agreements between plaintiffs and the Tribe, and the BIA was not a party. The BIA admittedly had important roles with respect to the permits, both as a facilitator between the Tribe and plaintiffs and as the Tribe's trustee whose approval was required for the Tribe to offer the permits. But the Tribe, not the BIA, owned the reservation land and the BIA lacked the authority to enter into a mining lease on reservation land in the event the Tribe refused to sign such a lease. *See* 25 U.S.C. § 396a (both the tribe and the Secretary must approve leases authorizing mining on Indian reservation land). Plaintiffs have not pointed to any contract term or any regulation that grants such authority to the BIA or renders the BIA legally responsible if the Tribe refuses to sign a lease.

The BIA's limited role in this regard is apparent from the original "Notice of Sale" sent to potential bidders for permits. That "Notice of Sale" contained both a sample permit and a sample lease. Each sample took the form of a draft agreement between the Tribe and a successful bidder and each required the signatures of both the president and the secretary of the Northern Cheyenne Tribal Council as well as the signatures of representatives of the successful bidder. As this court explained in *NRG I*, 24 Cl.Ct. at 58, under the terms of the permit agreements, the Tribe was obliged to grant a lease if the permit holder complied with all prereq-

uisites. But the Tribe's obliging itself to enter a lease does not mean that in the event the Tribe reneged, the Tribe transferred to the BIA the right to sign the lease for the Tribe or that the BIA became personally liable for the Tribe's failure to sign.

Second, plaintiffs are correct that the Cancellation Act anticipated suits against the United States and not against the Tribe in response to the cancellations. But Congress anticipated such suits because unless binding cancellation agreements were reached, the United States would be engaging in an affirmative act—cancellation of the permits— which potentially could damage the permit holders. The recognition that the United States may be liable for cancelling a permit is not the same as saying the United States was legally obliged, prior to the Cancellation Act, to issue a lease or to compensate a permit holder for the Tribe's failure to sign a lease. The two obligations are distinct.[11]

Herein, the United States is liable only for its act of cancelling plaintiffs' permits and, as explained above, just compensation for such an act is the value of the permits to plaintiffs at the time of permit cancellation. In calculating that value, this court must consider all facts relevant to valuation, including the facts that the Tribe had decided not to permit mining on its reservation land and that the Tribe was immune from a suit seeking to require it to comply with its permit obligations to the contrary.[12] Consideration of these facts demands a conclusion that the value of full contract performance is not an appropriate measure of compensation due plaintiffs. Indeed, if plaintiffs were awarded the value of full contract performance, plaintiffs would receive more than the value of the

**11.** Plaintiffs cite *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed.Cir.1990), for the proposition that tribal sovereign immunity is not relevant to either the issue of whether a taking occurred or the issue of the amount of compensation that should be paid for any taking. This court agrees with plaintiffs that a taking occurred herein. But as to damages, *United Nuclear* is not on point because the court remanded that case "indicat[ing] no views concerning the basis upon which just compensation is to be determined or the amount to be awarded." *Id.* at 1438.

**12.** In their respective complaints, plaintiffs presented two other theories of government liability: that the Cancellation Act violated Article I, Section 8 of the Constitution as beyond constitutional authority; and that the Cancellation Act constituted a breach of contract. Plaintiffs did not present either theory during pre- or post-trial briefing. In any event, neither theory could result in any award greater than the award here, *i.e.*, the amount of payment necessary to place plaintiffs in the same financial position they would have been had the government never taken their property.

property at the time it was taken, which would result in an improper windfall to plaintiffs.

### *Conclusion*

For the reasons set forth above, the appropriate amount of compensation due plaintiffs as of the date of cancellation of the permits is the total amount plaintiffs had paid to both the Tribe and the BIA to secure or renew their permits. The parties shall make a reasonable effort to reach a stipulation as to that amount. In the event the parties are unable to reach a stipulation, and the parties do not previously reach a settlement, on or before April 8, 1994, the parties shall file a joint status report advising the court as to the issues remaining to be resolved and proposing scheduling for presentation of those issues to the court.

**IT IS SO ORDERED.**