NRG COMPANY, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 671–86L, 672–86L.

United States Court of Federal Claims.

Aug. 11, 1994.

Sidney R. Thomas, Billings, MT, for plaintiffs.

Thornton Withers Field, Washington, DC, for defendant. Karl Kiehn, U.S. Dept. of the Interior, of counsel.

## OPINION

ANDEWELT, Judge.

In these consolidated actions, plaintiffs, NRG Company, Mike T. Gustafson, William H. Lang, Bellford & Co., Cormorant Corp., Wesco Resources, Inc. (Wesco), and Thermal Energy, Inc. (Thermal), seek payments from the United States for damages they suffered as a result of the enactment of the Act of October 9, 1980, Pub.L. No. 96–401, 94 Stat. 1701 (1980) (the Cancellation Act), which, as of January 1, 1982, cancelled three mineral prospecting permits owned by plaintiffs. These permits entitled plaintiffs to explore for coal on specified lands on the Northern Cheyenne Indian Reservation in Montana. In an August 28, 1991, opinion, this court held that the United States is liable for a Fifth Amendment taking of plaintiffs' property. *NRG Co. v. United States*, 24 Cl.Ct. 51 (1991) (*NRG I*). After conducting a trial on damages, in a February 22, 1994, opinion, the court concluded that plaintiffs are entitled to recover "the total amount plaintiffs had previously paid to both the Department of the Interior's Bureau of Indian Affairs (BIA) and the Northern Cheyenne Indian Tribe (the Tribe) to secure and renew their permits." *NRG Co. v. United States*, 30 Fed.Cl. 460, 460–61 (1994) (*NRG II*). The issues remaining before the court are as follows: (1) whether the Assignment of Claims Act, 31 U.S.C. § 3727, barred Wesco and Thermal from reassigning the instant permits to the original permit holders; (2) whether plaintiffs are entitled to "pretaking interest," *i.e.*, (a) interest on their initial permit payments from the time plaintiffs made the payments to the time of the taking, or (b) interest on their renewal payments from June 1973, the date on which the BIA placed these payments in escrow, to the date of the taking; (3) determining the proper compensation due plaintiffs for defendant's delay in paying plaintiffs for the taking of their permits; and (4) whether either party should be awarded costs or sanctions. The court will examine each of these issues in turn.

## I.

The Assignment of Claims Act bars a party, under specified circumstances, from assigning a claim against the United States to another party.[1] This statutory prohibition on the assignment of claims is subject to waiver by the United States. *Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 285, 614 F.2d 740, 745 (1980) (citing *Maffia v. United States*, 143 Ct.Cl. 198, 203, 163 F.Supp. 859 (1958)).

Herein, to understand defendant's argument that the Assignment of Claims Act barred the reassignment of the instant permits to the original permit holders, the court must first place defendant's argument in a factual context. Plaintiffs NRG Company, Mike T. Gustafson, William H. Lang, Bellford & Co., and Cormorant Corp., were the original holders of the permits in issue. On June 19 and July 8, 1981, approximately six months before the Cancellation Act effected cancellation of the permits, the original permit holders executed "Assignment Agree-

---

1. The Assignment of Claims Act, 31 U.S.C. § 3727, provides, in pertinent part:
 (a) In this section, "assignment" means—
 (1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or

 (2) the authorization to receive payment for any part of the claim.
 (b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.

ments" with Thermal and Wesco, respectively. Pursuant to these agreements, Thermal and Wesco were to negotiate cancellation of the assigned permits in exchange for coal leases on other federal lands. Pursuant to Section 3(a) of the Cancellation Act, any such cancellation agreements had to be approved by the permit holders, the Tribe, and the Department of the Interior.

Under the "Assignment Agreements," the original permit holders initially assigned the permits to Thermal and Wesco and received an up-front payment of $25,000 for each agreement. If Thermal and Wesco were able to negotiate satisfactory cancellation agreements, and thus receive in exchange for the cancellations coal leases on other federal lands, the original permit holders would receive, under each agreement, certain royalties including a minimum payment of $600,-000 per agreement. If Thermal and Wesco were unable to reach satisfactory cancellation agreements, the original permit holders could reacquire the permits. With respect to such possible reassignments, the "Assignment Agreements" provided that if Thermal and Wesco did not reach cancellation agreements by December 31, 1981, and had not waived certain conditions set forth in the agreements, "either [Thermal and] Wesco or the [original permit holders] may terminate this Agreement upon notice to the other party whereupon the obligations of [Thermal and] Wesco and the [original permit holders] hereunder shall be discharged, except that [Thermal and] Wesco shall execute and deliver a reassignment of the Permits to the [original permit holders]." Thermal and Wesco failed to negotiate satisfactory cancellation agreements and, after the Cancellation Act effected cancellation of the permits on January 1, 1982, Thermal and Wesco reassigned the permits to the original permit holders.

The complaints as originally filed included all of the present plaintiffs except Wesco and Thermal. Defendant moved to dismiss the action on the ground that Wesco and Thermal are indispensable parties to this action

because they owned the permits at the time the permits were cancelled pursuant to the Cancellation Act. On June 12, 1990, the court granted a motion by plaintiffs for (1) joinder of Wesco and Thermal as parties to this action, and (2) entry of judgment to the effect that Wesco and Thermal have no interest in the instant permits or this litigation.

Defendant now contends that neither the original plaintiffs nor Wesco and Thermal can secure a monetary judgment herein. Defendant argues that the reassignments of the permits from Wesco and Thermal to the original permit holders after the permits were cancelled constitute assignments of claims against the United States that are invalid under the Assignment of Claims Act. Therefore, defendant argues, those plaintiffs in this action to whom Wesco and Thermal reassigned the permits, i.e., all of the original plaintiffs, were not eligible to bring the instant action and cannot secure a monetary judgment on their takings claim. Defendant further argues, in effect, that Wesco and Thermal also are barred from receiving a monetary judgment because this court granted plaintiffs' motion for entry of judgment to the effect that Wesco and Thermal "have no [financial] interest" in this litigation. Defendant's arguments must fail, however, because, as explained below, defendant waived the provisions of the Assignment of Claims Act and thus permitted an assignment of the instant takings claim against the United States from Wesco and Thermal to the original plaintiffs. Indeed, it was the existence of such a waiver that prompted the court's June 12, 1990, allowance of plaintiffs' motion for entry of judgment to the effect that Wesco and Thermal "have no [financial] interest" in this litigation.[2]

Defendant waived the provisions of the Assignment of Claims Act when it approved the "Assignment Agreements." The "Assignment Agreements" were integrated agreements that contained the obligations both of the original permit holders to assign the permits and of Thermal and Wesco to

---

**2.** Contrary to defendant's counsel's recollection, the court allowed plaintiffs' motion for entry of judgment after the court had contacted defendant's counsel. The court telephoned defendant's counsel to determine whether he objected to plaintiffs' motion, and contemporaneous notes from that call state that defendant's counsel said that he did not object.

reassign the permits to the original permit holders under certain conditions. Defendant specifically approved these integrated agreements in letters dated December 28, 1981, from the Area Director of the BIA informing the permit holders that "[w]e have reviewed the Assignment Agreement[s] with care and find [them] satisfactory and the same [are] hereby approved. The Field Solicitor concurs in this action."

Defendant argues, in effect, that the BIA should be deemed at the time to have approved only the initial assignments to Wesco and Thermal, and that under the terms of the permits and pursuant to the pertinent regulations, the subsequent reassignments specifically provided for in the same agreements required subsequent written approval. *See, e.g.,* 25 C.F.R. § 162.12 (an assignment of any permit may be made only with the approval of the Secretary of the Interior and the written consent of all parties to such permit). But nothing in the December 28, 1981, letters suggests any such limitation on the scope of the approval. The approval in no way suggests that the BIA did not approve all of the possible contingencies provided for in the agreements. Indeed, the BIA approved the agreements only a few days before the Cancellation Act would effect cancellation of the permits. Thus, at the time of the approval, the BIA reasonably anticipated that the original permit holders would exercise their rights under the "Assignment Agreements" and seek reassignment of the permits in the event the permit holders, the Department of the Interior, and the Tribe would not approve cancellation agreements.

Moreover, defendant's interpretation of the agreements is not reasonable because it does not reasonably protect the original permit holders' financial interests. The original permit holders had the option of retaining the permits and bringing an action in this court after the permits were cancelled pursuant to the Cancellation Act. Instead, in an apparent effort to avoid such litigation, the original permit holders entered the "Assignment Agreements" in which they potentially could have received a minimum of $600,000 for each agreement if cancellation agreements could be reached. If cancellation agreements could not be reached, defendant's proposed interpretation of the agreements, which would require subsequent BIA approval before the permits could be reassigned to the original permit holders, would leave the original permit holders open to the possibility that such approval could be denied. In such an event, not only would the original permit holders be denied any significant payments from Thermal and Wesco but also they would lose their cause of action for cancellation of the permits.

The far better interpretation of the agreements is that the December 28, 1981, approval covered all of the provisions set forth in the "Assignment Agreements," including any reassignments. Defendant's interests would not be compromised in any significant way by such an interpretation. When the BIA approved the "Assignment Agreements," it did so in an apparent effort to further Congress' intent behind the Cancellation Act—to secure a fair settlement without litigation. There is no reason to believe that when the BIA approved the "Assignment Agreements" it had any significant preference as to whether Thermal and Wesco or the original permit holders should bring a suit in the event satisfactory cancellation agreements could not be reached. Because the permits would have been cancelled prior to any such suit, any reassignment of the permits would not directly affect the rights of the Tribe, and hence, the BIA's concern about promoting tribal interests would not be involved. Advance approval of any future reassignment to the original permit holders would be an essentially costless way for defendant to encourage the securing of cancellation agreements and the avoidance of litigation.[3]

---

3. To encourage permit holders to reach agreements, the Cancellation Act permitted the government to offer two types of inducements: (1) leases to federally owned coal deposits; and (2) bidding rights in future federal coal lease sales. Because there had been a long-standing moratorium on the sale of federal coal leases at the time, the bidding credits were of uncertain value and thus, the better of the two alternatives was noncompetitive federal coal leases. Under Section 3(a)(1) of the Cancellation Act, the government was authorized to grant noncompetitive leases only for deposits "which for the foreseeable future are unlikely to be separately mined

In sum, the various provisions of the "Assignment Agreements" were interrelated and the reassignment provisions were as integral to the agreement as the original assignments. When the BIA approved the "Assignment Agreements," it approved all of the contingencies therein, including the possible reassignment of the permits to the original permit holders if no cancellation agreements could be reached. The BIA necessarily recognized at the time of approval that if no cancellation agreements were reached by January 1, 1982, the permits would be cancelled by law. By approving agreements that anticipated reassignments at an undefined future date, the BIA waived the protection of the Assignment of Claims Act and thereby authorized the reassignments in issue herein.

## II.

In *NRG II*, 30 Fed.Cl. at 460–61, this court held that plaintiffs are entitled to recover "the total amount plaintiffs had previously paid to both the [BIA] and the [Tribe] to secure and renew their permits." The court subsequently denied a motion by plaintiffs seeking reconsideration of that opinion to permit certain additional compensation. In their post-decision briefs, plaintiffs seek yet additional and different forms of compensation. Plaintiffs seek (1) interest on their initial payments for acquisition of the permits from the date of payment to the date of the taking, and (2) interest on their renewal payments from the date the BIA placed the payments in escrow to the date of the taking.

Plaintiffs' request for such "pretaking interest" amounts to another motion for reconsideration of *NRG II* and, as such, is out of time. *See* RCFC 83.2(f). In any event, timing aside, neither interest award would be warranted. The court based its award in *NRG II* on the outcome of hypothetical negotiations between the Tribe and plaintiffs. *Id.* at 466. Given the Tribe's hostility toward plaintiffs, the court concluded that the Tribe would not have agreed to give compensation to plaintiffs greater than the monies plaintiffs had paid to the Tribe, *i.e.*, the Tribe would not have paid any interest or returned any interest it had received. Indeed, the trial evidence, including specifically the testimony of Jase O. Norsworthy, *see id.* at 464, does not suggest that plaintiffs had any expectation that they would secure such additional compensation.

## III.

### A.

Under the Fifth Amendment, property owners are entitled to "just compensation" for the taking of their property. For the reasons set forth in *NRG II*, the value of the property taken herein as of the date of the taking is equal to "the total amount plaintiffs had previously paid to both the [BIA] and the [Tribe] to secure and renew their permits." *Id.* at 460–61. The parties have stipulated that amount to be $220,000. But the courts have recognized that to be "just," the compensation award must include not only the value of the property on the date of the taking, but also compensation for any significant delay in the government's payment of the award to the property owner. Just compensation should "insure that [the property owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984).

Both parties herein propose that the court calculate this delay component of "just compensation" by allowing interest on the $220,000 value of the property taken from the date of the taking, January 1, 1982, to the date of payment. Both parties further propose that when calculating such interest, the court employ the published interest rates

---

efficiently or economically except by incorporation into an existing mining unit controlled by [the party to the cancelled permit]." Hence, the only entities in a position to benefit most efficiently from a noncompetitive federal coal lease were those entities that owned coal lands adjacent to such a federal coal deposit. Wesco and Thermal owned such land while the original permit holders did not. Hence, Wesco and Thermal were more likely than the original permit holders to negotiate satisfactory cancellation agreements as they could receive federal coal leases while the original permit holders could have negotiated only for the less desirable bidding rights.

used for judgments awarded to government contractors in suits brought against the United States pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 611. The parties disagree, however, as to the method of calculating the interest based on those published rates. Plaintiffs contend that the court should compound the interest semiannually, and defendant contends that the court should grant only simple interest.

### B.

This court's precedent offers considerable support for employing CDA interest rates when calculating the delay component of "just compensation" in Fifth Amendment takings cases. Some courts have granted simple interest based on the CDA rates, *e.g., Paul v. United States,* 21 Cl.Ct. 415 (1990), *aff'd,* 937 F.2d 623 (Fed.Cir.1991); *Yaist v. United States,* 17 Cl.Ct. 246 (1989); *Cloverport Sand & Gravel Co. v. United States,* 6 Cl.Ct. 178 (1984); others have granted compound interest based on those same rates, *e.g., Whitney Benefits, Inc. v. United States,* 30 Fed.Cl. 411, 416 (1994); *Bowles v. United States,* 31 Fed.Cl. 37, 52 (1994). In *Foster v. United States,* 3 Cl.Ct. 738, 745 (1983), *aff'd,* 746 F.2d 1491 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 478 (1985), the court explained the rationale for using CDA rates in such cases as follows:

> For purposes of uniformity in compensation of claims against the Government, flexibility in administration, notice to the public, and judicial efficiency, rates established under the method required in the Contract Disputes Act are determined to be appropriate for computation of just compensation in this taking case....

■ While this court acknowledges these potential benefits and is respectful of its own precedent, the court cannot agree that the CDA interest rates should be applied uniformly in calculating the delay component of just compensation. The reason is that the CDA interest rates typically are not a reasonable measure of a property owner's economic loss resulting from a delay between the government's appropriation of the property and its payment of the value of the property to the property owner.

■ There is no statutory basis for employing CDA interest rates in takings cases. Pursuant to 41 U.S.C. § 611, the CDA interest rates are used in government contract cases to measure interest to be paid to government contractors on valid claims previously presented by the contractors to government contracting officers. The CDA interest obligation begins to run on the date the contractor presents a proper claim to the contracting officer and continues to run until the date of payment.

■ To understand the lack of correlation between the CDA interest rates and the economic loss suffered by a property owner as a result of a delay in payment in a takings case, it is necessary to appreciate how the CDA interest rates are calculated and the assumptions that apparently underlie that calculation. The CDA interest rates are calculated based on the applicable private commercial interest rates for new loans maturing in approximately five years.[4] These private commercial interest rates normally are significantly higher than the rates paid by the United States Department of the Treasury on five-year term Treasury notes, as it is far safer to make a loan to the United States than to a private entity. In other words, private commercial rates are higher than rates on comparable term Treasury securities because private commercial rates incorporate the risk that a private entity borrowing the money will not be able to repay the loan on time.[5]

---

4. In *Brookfield Constr. Co. v. United States,* 228 Ct.Cl. 551, 567, 661 F.2d 159, 169 (1981), the court explained this calculation as follows:

> Under section 12 of the Contract Disputes Act, interest is to be paid "at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board." 41 U.S.C. § 611. The rate established by the Secretary under the Renegotiation Act (now expired) was based on "current private commercial rates of interest for new loans maturing in approximately five years," 50 U.S.C. app. § 1215(b)(2) (1976), and was adjusted as necessary at six month intervals. *Id.*

5. For years 1983–1992, the following chart lists the CDA interest rates as modified on a semiannual basis (January 1–June 30 and July 1–De-

By obliging the government in CDA cases to pay contractors interest based on a five-year private commercial loan rate, the CDA, in effect, treats all contractors as though (1) the contractor had borrowed in the private commercial market the entire amount of money the government ultimately found to owe the contractor, and (2) the contractor's loan, with interest adjusted every six months, remained outstanding until the date the government made its payment. The CDA interest rates thereby serve to repay the contractor for its costs related to such a hypothetical loan. This method of calculating interest may be favorable to contractors because contractors often can perform the contract work without having to borrow money at the five-year private commercial rate and without having to maintain such a loan until the contractor receives payment from the government. For example, a contractor could finance the cost of the contract work by using its available cash or equivalent liquid assets or by securing loans at a more favorable rate than the five-year commercial rate, such as a fully collateralized loan.

The legislative history of the CDA indicates that Congress viewed the CDA interest provision as appropriate in government contract cases given the "unique" nature of certain provisions the government includes in its contracts. The pertinent House Report provides, in relevant part:

> The rights of Government contractors who prevail on claims against the Government are unique since they have been required by language of the contract, for example, the changes article and the disputes article, to perform the work as directed by the Government without stopping to litigate. Thus, Government contractors must perform and then argue about the amount of the equitable adjustment at some later time. Since the contractor has been compelled to perform the work with its own money—in the total absence of contract payments or progress payments—there can be no equitable adjustment to the contractor until the contractor recovers the entire cost of the additional work. The cost of money to finance this additional work while pursuing the administrative remedy, normally called interest, is a legitimate cost of performing the additional work.

H.R.Rep. No. 1,556, 95th Cong., 2nd Sess. 32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5266.

Congress' decision to use the CDA interest rates in "unique" circumstances as a part of the CDA's comprehensive revision of government contract law does not mean that these

cember 31) and the average Treasury note yield (calculated by averaging daily figures during the year).

| Period | CDA Rates | Five–Year Treasury Note Yield (TNY) | Period | CDA Rates | TNY |
|---|---|---|---|---|---|
| 1983 | 11¼% (1/1–6/30) 11½% (7/1–12/31) | 10.79% | 1988 | 9⅜% (1/1–6/30) 9/¼% (7/1–12/31) | 8.47% |
| 1984 | 12⅜% (1/1–6/30) 14⅜% (7/1–12/31) | 12.26% | 1989 | 9¾% (1/1–6/30) 9⅛% (7/1–12/31) | 8.50% |
| 1985 | 12⅛% (1/1–6/30) 10⅜% (7/1–12/31) | 10.12% | 1990 | 8½% (1/1–6/30) 9% (7/1–12/31) | 8.37% |
| 1986 | 9¾% (1/1–6/30) 8½% (7/1–12/31) | 7.30% | 1991 | 8⅜% (1/1–6/30) 8½% (7/1–12/31) | 7.37% |
| 1987 | 7⅝% (1/1–6/30) 8⅛% (7/1–12/31) | 7.94% | 1992 | 6⅞% (1/1–6/30) 7% (7/1–12/31) | 6.19% |

For CDA rates from June 26, 1986, through June 30, 1992, *see Formanek v. United States*, 26 Cl.Ct. 332, 341 n. 11 (1992). For CDA rates for other years, *see* 58 Fed.Reg. 36,511 (1993); 57 Fed. Reg. 62,418 (1992); 57 Fed.Reg. 29,559 (1992); 57 Fed.Reg. 428 (1992); 51 Fed.Reg. 1,469 (1985); 50 Fed.Reg. 27,525 (1985); 49 Fed.Reg. 50,357 (1984); 49 Fed.Reg. 26,335 (1984); 48 Fed.Reg. 57,044 (1983); 48 Fed.Reg. 29,985 (1983); 47 Fed.Reg. 57,388 (1982). For the

same rates would make economic sense in measuring the delay component of just compensation in takings cases. It would generally be inappropriate in takings cases to employ the dual fictions that the property owner borrowed the entire value of the property at the five-year private commercial rate and that the loan was outstanding from the date of the taking to the date of payment. Actions alleging a government taking frequently involve real property. Typically, at the time a taking of real property occurs, the property is not covered by outstanding loans equal to 100 percent of the value of the property. Hence, a property owner ordinarily should not be viewed as having an outstanding loan covering the entire value of the real property at the time of the taking, much less as having that entire loan outstanding during the entire period up through the date of government payment. In addition, real estate loans are collateralized loans and often can be obtained on comparatively better terms than an unsecured five-year loan.

 While the instant action involves a taking of intangible rather than real property—mineral prospecting permits, it would appear that as with real estate, on the date of any government appropriation, mineral prospecting permits ordinarily would not be covered by loans equal to 100 percent of their value. Indeed, in the instant action, there is no evidence that plaintiffs had used anything other than available cash to pay for the permits and renewals. In such a setting, application of the CDA's five-year private commercial rate would not be an economically rational way to "insure that [the property owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest,* 467 U.S. at 10, 104 S.Ct. at 2194. Because plaintiffs had not borrowed any money at the five-year commercial rate, it would not be appropriate to compensate them as though they had.[6]

### C.

What formula then should the court employ in calculating the delay component of just compensation due plaintiffs? If defendant had made the payments on the date of the appropriation, plaintiffs apparently could have invested those funds as of that date. Plaintiffs could have made a comparatively safe investment or a risky investment. As generally described above, the more risk plaintiffs would have accepted, the higher their potential maximum return from the investment. But, at the same time, the more risk plaintiffs would have accepted, the more indefinite the amount of return and the greater the chance of losing some of the investment.

 When a court calculates the delay component that would put a property owner "in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation," the court need not engage in a factual determination as to how a

Treasury Note Yield, *see* U.S. Bureau of the Census, *Statistical Abstract of the United States: 1993* 522 (113th ed.) Washington, D.C., 1993.

6. Calculating interest using the CDA interest rates and then compounding the interest semiannually, as plaintiffs propose, would seem, if anything, to compound the analytical problem that is presented when employing in Fifth Amendment takings cases rates designed for government contract actions. While the CDA interest rates are adjusted semiannually, the interest granted is not compounded; only simple interest is paid. *Brookfield,* 228 Ct.Cl. at 568 n. 27, 661 F.2d at 170. Thus, Congress apparently decided that using the five-year commercial rate but awarding simple interest would produce appropriate compensation for the government's delay in paying its obligations to government contractors. Applying the CDA rates to takings cases and then compounding the interest would therefore depart from the model established in the CDA for calculating appropriate compensation for government delay in making payments. It would not be appropriate to award compound CDA interest to address inflation that occurred between the date of the taking and the date of payment because the CDA interest rates are not a measure of the inflation rate. In this regard, the following chart lists the average annual inflation rates and the average CDA interest rates, according to defendant's statistics, for years 1985–1990.

| | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|---|
| Inflation Rates | 3.6% | 1.9% | 3.6% | 4.1% | 4.8% | 5.4% |
| CDA Rates | 11.44% | 9.13% | 8.25% | 9.31% | 9.44% | 8.75% |

particular property owner would have invested the payment due and how much it would have earned on that investment. First, such a determination typically would involve a complex factual assessment that would require fairly extensive speculation, *i.e.* would the property owner actually have made the investment it alleged it would have made and would that investment really have turned out as the property owner alleged. Second, in any event, it is not apparent that an assessment of what compensation would be "just" in a takings case should depend upon how a particular individual would have chosen to invest the amount due. It would not seem necessary in order to achieve "justice" with respect to a governmental taking of property for the United States to compensate a property owner for a highly risky, and ultimately successful, investment that the property owner never made but would have made had it received the payment due on time. Analogously, "justice" would not dictate that the United States be free from all liability for an appropriation of private property if the United States could demonstrate that had it paid over the value of the property on the day of appropriation, the property owner would have made an unfortunate and ill-timed investment and lost all of the money.

Instead of calculating the delay component of compensation based on the investment philosophy of the individual property owner, it would seem preferable to use a more generic approach and one less likely to rest firmly on speculation. At least with respect to facts analogous to the instant case, the court sees two viable options for calculating the delay component of just compensation.

The first option is to base the delay compensation on the change in the cost of living during the period of delay. Thus, for example, if the property appropriated was worth $1,000 on the date of taking, and the government did not pay compensation until five years after the taking, during which time inflation totalled 200 percent, then "just compensation" would be $3,000, *i.e.*, $1,000 for the value of the property on the date of the taking and $2,000 for an inflation adjustment. This approach would arguably place the property owner in "as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation" in that this approach assures that the compensation paid to the property owner is equal in terms of its purchasing power to the value of the property on the date of the taking.

The second option is to assume that the government paid the property owner on the date of appropriation and that the property owner had invested the payment in United States government securities. This approach can be argued to produce "just compensation" because it gives the property owner the benefit of a profitable but essentially risk-free investment that would have been available on the date of appropriation. At the same time, this approach avoids the speculation inherent in a court trying to determine how a property owner actually would have invested the payment and whether any significant risk assumed in that investment would have proved profitable. Choice of this second option would require compounding the interest on a regular basis because had the property owner actually invested in government securities, he or she would have had the opportunity to reinvest the proceeds as each security matured.

Application of either of these alternatives to a particular class of takings cases or to all takings cases would generally secure the benefits the *Foster* court sought to secure in applying the CDA interest rates. Historical data is readily available for both the cost of living option and the government securities option and the choice of either option could bring a level of "uniformity in compensation of claims against the Government, flexibility in administration, notice to the public, and judicial efficiency." *Id.* at 745. At least in fact situations such as in the instant case, where the property when taken was not the subject of any loan, either of these two options represents a sounder economic approach than employing the CDA interest rates to calculate the economic harm to plaintiffs resulting from the United States' delay in paying the value of the property it appropriated.

Selecting between these two viable options, the court chooses the second. The court bases this choice on Congress' recent

study of just compensation for the government's appropriation of private property in an eminent domain setting, which ultimately led to the adoption of the Declaration of Taking Act, 40 U.S.C. §§ 258a–258e (the Takings Act). The Takings Act adopts an approach along the lines of the second option herein. Pursuant to 40 U.S.C. § 258a, in eminent domain proceedings, the court may order that the United States make a payment to the court in advance of final judgment which the court can then turn over to the property owner. In the event the court ultimately determines that the value of the property taken exceeds the amount the government had previously paid over to the court, the government must then pay as "just compensation" the difference between the two amounts plus interest on that difference running from the date of the taking to the date of the payment. With respect to calculation of the interest, Section 258a provides that the "judgment shall include, as part of the just compensation awarded, interest [in accordance with Section 258e–1 of the Takings Act]." Section 258e–1(1) in turn provides that interest shall be calculated based on the interest rate of the 52–week Treasury bill. When the government's delay exceeds 52 weeks, Section 258e–1(2) provides that the delay component shall be calculated on an annual compound basis, using successive 52–week Treasury bill rates.

Thus, after study, when enacting the Takings Act, Congress chose not to calculate the delay component of just compensation in eminent domain proceedings by using either the cost of living option mentioned above, or the CDA approach utilized in *Foster*. In his statement upon signing the Takings Act, the President described the Takings Act's use of the 52–week Treasury bill rate as "fair and reasonable" and stated: "[E]stablishment of this uniform rate applicable in all courts in all cases covered by the bill will avoid discrimination among property owners and will benefit the parties and the courts by eliminating the need to litigate in order to secure a fair and appropriate rate of interest." H.R.Rep. No. 914, 99th Cong., 2nd Sess. (1986), *re-*

*printed in* 1986 U.S.C.C.A.N. 6202, 6206 (statement of President Ronald Reagan).

Defendant argues that this court should not use the approach adopted in the Takings Act because by its terms, the Takings Act does not cover the instant situation and hence, the court's resort to the Takings Act approach would "arrogate congressional prerogatives." But defendant would be guilty of the same sin in that defendant proposes using the CDA interest rates to calculate the delay component of just compensation in takings cases, while Congress never specifically authorized such use. More fundamentally, however, defendant's argument misses the basic point. This court has a constitutional duty to award just compensation. The issue before the court is how best to calculate that compensation. Congress has considered this issue in an analogous context and the court, when determining how to meet its own obligations, certainly cannot be barred from considering and applying the lessons that Congress has learned from its own study of the just compensation issue.[7] In this regard, the court is not awarding interest without congressional authorization, *Library of Congress v. Shaw*, 478 U.S. 310, 314, 106 S.Ct. 2957, 2961, 92 L.Ed.2d 250 (1986), but rather is simply calculating the delay component of just compensation and employing an interest rate approach.

### D.

This court does not depart lightly from its own precedent employing CDA interest rates in takings cases. But, as described above, the court's precedent in this area remains in a state of flux and the CDA interest rates have not been applied in a uniform way. The parties herein ask the court to choose between precedent that allows CDA interest on a simple basis and precedent that allows CDA interest on a compound basis. But the court cannot choose between these alternatives without first analyzing which choice would accomplish the required task—to place the property owner in "as good a position

---

7. While defendant opposes this court's selection of the second option, defendant takes the position in its briefs that the compensation scheme created in the Takings Act was the product of "much study by government agencies."

pecuniarily as he would have occupied if the payment had coincided with the appropriation." Upon conducting this analysis, the court concludes that neither proposed application of the CDA interest rates is appropriate because the CDA interest rates were not designed to and do not accurately assess the delay component of just compensation in takings cases.

■■■ This era appears to be one of increased litigation of Fifth Amendment takings claims. (This court's statistics show that the number of takings cases filed herein has approximately doubled since 1983.) Many of these cases, like the instant action, are not resolved by the courts until many years after the taking. As a result, the component of the "just compensation" award covering post-appropriation delays in government payments can approach and even exceed the value of the property taken. In such a setting, to be faithful to the precepts of the Fifth Amendment, it is crucial that when calculating the delay component of a takings award, this court employ a methodology that is designed to produce an award that constitutes "just compensation." A compensation scheme is not "just" if it is not reasonably designed to compensate property owners for the economic harm suffered as a result of the government's delay in paying over the value of the property taken. At the same time, compensation is not "just" if the delay compensation is calculated in a way that produces a windfall to property owners well in excess of their economic loss. The dramatic difference that the choice of methodology has on the compensation award is apparent on the facts of this case. For example, using defendant's calculations, the delay component of the compensation award would be (1) approximately $350,000 if calcu-

lated to account exclusively for the effects of inflation (*i.e.*, the value of the property taken adjusted for inflation between the time of the taking and the date of payment), (2) approximately $480,000 if based on simple CDA interest rates, and (3) approximately $675,-000 if based on compound CDA interest rates.

For the reasons generally described above, the court concludes that the appropriate adjustment herein to account for the government's delay in payment is to provide interest on the value of the permits from the date of appropriation to the date of payment and to calculate that interest on a compound basis, using the 52-week Treasury bill rate as outlined in Section 258e-1 of the Takings Act. This procedure gives a more accurate measure of the economic harm suffered by plaintiffs than the CDA interest rates.[8] Moreover, this procedure not only would produce "just compensation" but also has the advantage of providing some level of symmetry in judicial determinations as to the delay component of just compensation. Compensation for delay in payment in the instant Fifth Amendment takings case and others like it would be calculated using an analogous approach to that applied in calculating the delay component of just compensation in eminent domain proceedings under the Takings Act.

## IV.

■■■ Defendant seeks an award of costs and the imposition of sanctions on plaintiffs for their failure to file complete and comprehensive expert reports pursuant to a pretrial order and for allegedly including new evidence and argument in their post-trial briefs. Defendant relies upon RCFC 11 and this court's "inherent authority to manage its

---

8. CDA rates typically are significantly higher than the rates of 52-week Treasury bills. *See* U.S. Bureau of the Census, *Statistical Abstract of the United States: 1993* 520 (113th ed.), Washington, D.C., 1993. For example, for 1985, the CDA rates as modified January 1 and July 1 were 12⅛ percent and 10⅜ percent, respectively, while the 52-week Treasury bill rate was 7.81 percent. For 1990, the corresponding CDA rates were 8½ percent and 9 percent, respectively, and the 52-week Treasury bill rate was 7.35 percent. A decision to employ the 52-week Treasury bill

interest rates instead of CDA rates, however, will not necessarily result in a lower interest payment. If the Treasury bill interest rate is compounded and the CDA rate is not, over an extended period of time, interest based on the Treasury bill rate could exceed interest based on the CDA rate. But the point of this decision is not which approach yields a higher or lower payment, but rather which approach is the more accurate measure of the economic harm to property owners.

docket" as grounds for this action. Plaintiffs respond that the conduct of which defendant complains was not improper and was based upon plaintiffs' misunderstanding as to their obligations under the pretrial order. Plaintiffs also argue that if the court considers sanctions, the court should award sanctions against defendant for certain of defendant's actions.

The court is concerned with the appropriateness of certain of plaintiffs' actions and admonishes plaintiffs' counsel in the future to read court orders more carefully. But based on a review of the relevant circumstances and arguments, the court concludes that the conduct in question does not constitute a violation of RCFC 11, and sanctions are not appropriate for any other reason. The court will not award costs or sanctions to either party.

## Conclusion

For the reasons set forth above, plaintiffs are entitled to $220,000 plus interest thereon from the date of the taking, January 1, 1982, to the date of payment. Such interest shall be calculated on an annual compound basis using successive 52–week Treasury bill rates. On or before September 9, 1994, the parties shall file a stipulation as to the amount due plaintiffs based on this decision.

IT IS SO ORDERED.