**TULARE LAKE BASIN WATER STORAGE DISTRICT, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 98–101L.**

United States Court of Federal Claims.

Aug. 18, 2004 *.

---

* This order modifies the court's December 31, 2003, opinion issued in this action.

Roger J. Marzulla and Nancie G. Marzulla, Marzulla & Marzulla, Washington, D.C., counsel for plaintiffs.

Fred R. Disheroon, with whom were Special Attorney Alf W. Brandt and Assistant Attorney General Thomas L. Sansonetti, U.S. Department of Justice, Environment and Natural Resources Division, Special Litigation Section, Washington, D.C., counsel for defendant.

## ORDER

WIESE, Judge.

Consistent with its decision of December 31, 2003, this court entered judgment on February 12, 2004, in favor of plaintiffs in the amount of $23,771,184.23, an award of just compensation that included an interest component based on the 52–week Treasury bill rate set forth in the Declaration of Taking Act, 40 U.S.C. § 258e–1 (2000). Plaintiffs filed a motion for reconsideration of that ruling on March 3, 2004, arguing that the 52–week Treasury bill rate does not provide them with full compensation for the taking of their property as required by the Fifth Amendment of the United States Constitution. Plaintiffs urge the court instead to apply either the agricultural operating loan rates in effect in the Tulare/ Kern County service areas from 1992–1994,[1] or the rates of return achieved by Tulare and Kern County on investments made during that same time frame pursuant to California law.[2] Defendant opposes plaintiffs' motion, asserting that the court properly identified the 52–week Treasury bill rate as the appropriate standard for determining the interest rate to be applied in this case.[3]

The court heard oral argument on plaintiffs' motion on June 21, 2004. For the reasons set forth below, the court finds in plaintiffs' favor and directs that the rates of return achieved on Tulare's and Kern County's state-sanctioned investments during the relevant time period be applied to plaintiffs' December 31, 2003, award.

## I.

Pursuant to the Fifth Amendment of the United States Constitution, an owner whose property is taken by the government for public use is entitled to the payment of just compensation, an amount ordinarily which the government files a formal declaration of taking, provides in relevant part:

> Interest required to be paid under sections 258a to 258e–1 of this title shall be calculated by the district court as follows:
> (1) Where the period for which interest is owed does not exceed one year, interest shall be calculated for such period from the date of taking at an annual rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of taking.
> (2) Where the period for which interest is owed is more than one year, interest for the first year shall be calculated in accordance with paragraph (1) and interest for each additional year shall be calculated on the combined amount of the principal (the amount by which the award of compensation exceeds the deposit referred to in section 258a of this title) and accrued interest at an annual rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the beginning of each year.
>
> 40 U.S.C. § 258e–1.

1. Plaintiffs identify the compounded interest rates to be applied under the operating loan rate method as 152.11 percent for 1992, 133.80 percent for 1993, and 117.05 percent for 1994.

2. Consistent with California law, Tulare Lake Basin Water Storage District and Kern County Water Agency have historically divided all of their funds among three state-created and-operated investment accounts. See Cal. Gov.Code §§ 16429.1, 53601 (Deering 2003); Cal. Water Code §§ 44456, 44852 (Deering 2003). During the period in question, Tulare invested its funds in the Kings County Investment Pool, and Kern County divided its funds between the Kern County Investment Pool and the Local Agency Investment Fund. Based on the returns achieved by those funds over the relevant period, plaintiffs urge the court to apply compounded interest rates of 69.22 percent to Tulare's recovery for 1992, 61.59 percent to its recovery for 1993, and 54.90 percent to its recovery for 1994. Similarly, plaintiffs ask the court to apply compounded interest rates of 69.77 percent to Kern County's recovery for 1992, 62.00 percent to its recovery for 1993, and 55.7 percent to its recovery for 1994.

3. The Declaration of Taking Act, which by its terms applies to an eminent domain action in

based on "the fair market value of the property on the date it is appropriated." *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). In the event that significant time has elapsed between the date of the taking and the payment of just compensation, however, the fair market value must be adjusted by "such addition as will produce the full equivalent of that value paid contemporaneously with the taking." *Seaboard Air Line Ry. v. United States,* 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664 (1923). Just compensation, in other words, requires that the owner of the property be compensated not only for the value of the property on the date of the taking, but also for any delay in payment of that amount. *NRG Co. v. United States,* 31 Fed.Cl. 659, 664 (1994).

Although no consensus has emerged with regard to the appropriate interest rate to be employed in just compensation cases (*see, e.g., Eastern Minerals Int'l, Inc. v. United States,* 39 Fed.Cl. 621, 631 n. 13 (1997) (applying the tax overpayment rate set forth in 26 U.S.C. § 6621); *NRG,* 31 Fed.Cl. at 670 (applying the Declaration of Taking Act rate set forth in 40 U.S.C. § 258e–1); *Formanek v. United States,* 26 Cl.Ct. 332, 341 n. 11 (1992) (applying the Contract Disputes Act rate set forth in 41 U.S.C. § 611)), courts have universally sought to honor two basic principles in calculating interest on awards paid after the date of taking. First, courts have uniformly endeavored to "ensure that [the property owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby,* 467 U.S. at 10, 104 S.Ct. 2187. Second, courts have generally recognized the "strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants." *Miller v. United States,* 223 Ct.Cl. 352, 620 F.2d 812, 838 (1980).

■ In determining whether a particular rate of interest is sufficient under the Fifth Amendment to provide the "full and perfect equivalent of the property taken," *Seaboard,* 261 U.S. at 304, 43 S.Ct. 354, courts have often relied on a standard referred to as the "prudent investor rule." Pursuant to this rule, the appropriate interest rate is calculated based not on an assessment of how a particular plaintiff would have invested any recovery, but rather on how "a reasonably prudent person" would have invested the funds to "produce a reasonable return while maintaining safety of principal." *United States v. 429.59 Acres of Land,* 612 F.2d 459, 464–65 (9th Cir.1980).

Plaintiffs in the instant case offer two approaches for calculating interest based on the prudent investor rule. Plaintiffs point first to the agricultural operating loan rates prevailing in the Tulare/ Kern County service areas for the period 1992–1994, rates they contend most accurately reflect the economic reality experienced by plaintiffs as a result of the government's taking. That is the case, plaintiffs explain, because the farmers from whom the water was taken finance the costs of the State Water Project (costs that must be paid irrespective of the amount of water actually delivered) by obtaining agricultural loans that are to be paid off when the crops are harvested and sold. Plaintiffs thus argue that it would have been irrational for the farmers to have invested timely payments of just compensation in Treasury bills—as application of the 52–week Treasury bill rate would reflect—when they were obligated to pay a higher interest rate on their outstanding loans. A "reasonably prudent" farmer, in other words, would have used a timely judgment to repay his operating loans and should therefore, in plaintiffs' view, receive the operating loan rate as compensation for the delay in payment of just compensation.

As an alternative method for satisfying the prudent investor rule, plaintiffs point to the rates achieved by Tulare and Kern County on their state-sanctioned investments as the reasonable return courts have identified as necessary for making a property owner whole. These rates, plaintiffs contend, provide a method for calculating interest that can be applied uniformly to all claimants and that represents "a reasonable rate of return consistent with a high level of safety."

Defendant, for its part, does not challenge the applicability of the prudent investor rule but argues that the interest rates plaintiffs

propose would provide them with an impermissible windfall. In support of this proposition, defendant cites *Georgia–Pacific Corp. v. United States*, 226 Ct.Cl. 95, 640 F.2d 328 (1980), a case in which a takings claimant, like the present plaintiffs, sought an interest rate based either on the return of a "productive investment" or on its actual costs to borrow money. Rejecting both approaches, the *Georgia–Pacific* court concluded that the claimant's theories "fail to provide an objective working rule, fail to consider all relevant data on which our decision must be made, and fail to ensure uniformity of treatment, a policy upon which we are required to place great weight." *Id.* at 366 (citations omitted). The court instead selected an interest rate that applied uniformly to all takings during that period, one based on Moody's Composite Index of Yields on Long Term Corporate Bonds.

Defendant similarly cites *Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106 (1976), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), for the proposition that employing interest rates based on a claimant's unique borrowing situation potentially gives rise to inequitable results. In refusing to base the interest rate on a patent claimant's actual costs of borrowing money, the *Pitcairn* court explained that a claimant "with a poor credit rating could theoretically receive an award of just compensation at very high interest rates because its actual cost of borrowing money might be very high, while another might be penalized for having a good credit rating." *Id.* at 1124. The *Pitcairn* court opted instead for a rate based on long-term corporate bond yields since those yields are "an indicator of broad trends and relative levels of investment yields or interest rates [and] cover the broadest segment of the interest rate spectrum." *Id.*

As an alternative, then, to the interest rates proposed by plaintiffs, defendant advocates the 52–week Treasury bill rate originally employed by this court. In support of this rate, defendant cites, *inter alia, NRG*, 31 Fed.Cl. 659, for the proposition that the compensation calculation for direct condemnation cases governed by the Declaration of Taking Act is conceptually identical to the compensation calculation for inverse condemnation cases. Defendant thus argues that the rationale relied upon by Congress in adopting the 52–week Treasury bill rate as the appropriate rate of interest for direct condemnation actions applies equally here. In addition, defendant points out that the Treasury bill rate has the advantage of being both uniform and easily accessible to courts and to the public at large. Finally, defendant argues that the Treasury bill rate reflects a reasonable return on investment—a rate that plaintiffs (or any other takings claimant) would have received for what defendant describes as a "de facto loan" to the government. Any additional amounts, defendant maintains, would afford plaintiffs a recovery in excess of the risk they actually faced.

## II.

■ In reexamining our earlier decision in light of the requirements of the prudent investor standard, we are compelled by the Ninth Circuit's conclusion that "[b]ecause a reasonably prudent investor would diversify his risk, it is proper to consider the rate of interest paid on different types of securities with different maturities." *United States v. 429.59 Acres of Land*, 612 F.2d at 465 (endorsing a rate that was derived from an average of "six-month Treasury bills, four–to six-month prime commercial paper, ninety-day prime bankers acceptances, and six-month bank certificates of deposit"). Indeed, numerous courts have applied market-based measures—as, for instance, corporate bond rates—to calculate the interest that would reasonably have been generated on a timely payment of just compensation. *See, e.g., Miller v. United States*, 620 F.2d at 840; *Georgia–Pacific*, 640 F.2d at 365; *Pitcairn*, 547 F.2d at 1121. Consistent with this approach, we conclude that the best measure of compensation in our own case is the rates of return achieved on plaintiffs' state-sanctioned accounts—accounts whose mix of investment instruments, we believe, provides a reasonable rate of return consistent with a high level of safety.

In identifying the Kings County Investment Pool, the Kern County Investment Pool, and the Local Agency Investment Fund

as the benchmarks for measuring plaintiffs' claim, however, we do not mean to stress the actual experience of plaintiffs as individual investors. As the court noted in *NRG*, 31 Fed.Cl. at 667–68, when calculating the delay component of just compensation, courts "need not engage in a factual determination as to how a particular property owner would have invested the payment due and how much it would have earned on that investment.... Instead ... it would seem preferable to use a more generic approach and one less likely to rest firmly on speculation."

It is indeed due to our desire to avoid such a "complex factual assessment [requiring] fairly extensive speculation," *id.* at 668, and further to avoid the award of non-uniform damages based on the water contractors' individual experiences, *Miller v. United States*, 620 F.2d at 838, that we must reject plaintiffs' alternate theory of recovery involving the operating loan rates. Application of such rates not only would require the court to find that the property owners would in fact have used any recovery to pay down their operating loans (a contention not bourne out by the evidence),[4] but also would require the application of different interest rates depending on the water contractors' unique borrowing circumstances.[5] We find such an approach to be unacceptable.

It is of course true that the Supreme Court has, on at least one occasion, allowed an interest award to be based on a claimant's actual cost of borrowing. *See Kansas v. Colorado*, 533 U.S. 1, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001) (in which the court concluded that the state of Colorado's breach of an interstate compact providing for the shared use of the Arkansas River "could best be remedied by an interest award that mirrors the cost of any additional borrowing the farmers may have been forced to undertake in order to compensate for lost revenue"). Yet, at stake in that case was not the rate of interest necessary to make a takings claimant whole, but rather the measure of expectancy damages associated with a contract breach. We therefore find *Kansas* inapposite to the instant case.

Turning, then, to defendant's argument, we find similar difficulties with applying the 52–week Treasury bill rate. As an initial matter, the legislative history of the Declaration of Taking Act suggests that Congress did not contemplate the application of the 52–week Treasury bill rate to any situation other than a formal declaration of taking: "The bill does not in any way affect legislative takings. It is an amendment to the Declaration of Taking Act." 132 Cong. Rec. S16844 (Oct. 16, 1986). As the Supreme Court noted, the Declaration of Taking Act had a twofold purpose: "to give the Government immediate possession of the property and to relieve it of the burden of interest accruing on the sum deposited from the date of taking to the date of judgment [and] to give the former owner, if his title is clear, immediate cash compensation to the extent of the Government's estimate of the value of the property." *United States v. Miller*, 317 U.S. 369, 381, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *see also United States v. Blankinship*, 543 F.2d 1272, 1275 (9th Cir.1976) (characterizing the Declaration of Taking Act as designed to "provide a means by which the United States can acquire quickly a fee simple absolute title to land taken 'for the use of the United States'"). The purpose of the act, in other words, is to provide compensation to the property owner in situations where the government exercises its power of eminent domain and payment is expected to follow quickly from the taking, rather than in situations where, as here, a significant amount of time has elapsed between the tak-

---

**4.** The trial record fails to show that any of the plaintiffs would in actuality have used a timely payment of just compensation to reduce their operating loan obligations. When faced with the government-caused water shortages, for example, the affected farmers variously testified to investing in new groundwater wells, paying for additional groundwater pumping, and purchasing water from the Drought Water Bank. None of these witnesses, however, testified that they would have used any recovery to reduce their operating loan obligations.

**5.** Although plaintiffs contend that the majority of the water contractors represented in this action received the same operating loan rate without regard to their creditworthiness, the fact that such a rate seemed to predominate is insufficient to ensure the strong judicial policy in favor of uniformity.

ing of the property and the payment of just compensation.

■ In addition, the application of the 52–week Treasury bill rate contemplates an award of just compensation from the perspective of the government's cost of borrowing rather than from the perspective of the claimant's rate of return. But as the *Pitcairn* court explained:

> The just compensation to which an owner is entitled when his property is taken by eminent domain is regarded in law from the point of view of the owner and not of the condemnor. In other words, just compensation in the constitutional sense is what the owner has lost, and not what the condemnor has gained. The yield on a series of hypothetical Government bonds is not relevant in ascertaining the injury plaintiff has suffered. It measures compensation only according to the point of view of the taker without reference to that of the owner since he is hardly likely to be able to borrow money at the rates the Government can.

547 F.2d at 1122. Echoing this sentiment, the court in *Redevelopment Agency v. Gilmore,* 38 Cal.3d 790, 214 Cal.Rptr. 904, 700 P.2d 794, 806 (1985), described the owner of taken property as "an involuntary lender to a debtor he would often prefer not to have." Based on that characterization, the court went on to say that "the risk of any difference between the rates the government would normally pay, and those the condemnee could have achieved by prudent participation in the broader market, should fall on the former." *Id.; accord Miller v. United States,* 620 F.2d at 839 (concluding that "[t]he Government, not the unwilling condemnee, should be the one to bear the risk of any fluctuations in interest rates").

Taken together, these concerns—that the 52–week Treasury bill rate was not intended to account for long periods of delay in the payment of just compensation and that it does not reflect the financial impact from the perspective of the property owner—cause us to retreat from our earlier holding that the interest rate set forth in the Declaration of Taking Act would render plaintiffs whole. As explained above, we believe that the prudent

investor rule requires a rate of return that more accurately reflects a diversified investment, such as the rates of return on plaintiffs' state-sanctioned accounts.

### III.

Having determined the appropriate interest rate to be applied to plaintiffs' judgment, we are left with one final issue: whether plaintiffs are in fact entitled to interest in light of what defendant terms a "delay" in filing their claim. In defendant's view, plaintiffs are ineligible for prejudgment interest or are at most eligible for a diminished interest award because they did not file suit until February 6, 1998, almost six full years after their earliest claim accrued (relying on *Alprin v. United States,* 124 Ct.Cl. 670, 676, 111 F.Supp. 280 (1953)). Defendant offers no proof, however, that such a delay was unreasonable. In addition, defendant's argument is refuted by *Miller v. United States,* which provides:

> If the amount of just compensation for delay in payment is properly set, the effect of any delay in payment should be approximately neutral with respect to both parties. It is constitutionally required that plaintiffs must receive an amount sufficient to produce the full equivalent of the value paid contemporaneously with the taking. Conversely, the benefit accruing to defendant through the delay in payment should be approximately cancelled by the additional amount payable because of the delay. The imposition of a fair rate of interest on defendant as part of an award of just compensation should not be viewed as a penalty for a wrongful delay of payment.

620 F.2d at 839 (citation omitted). We therefore conclude that plaintiffs are entitled to interest and that the amount of such interest should not be limited by the timing of plaintiffs' filing suit in this court.

### CONCLUSION

For the reasons set forth above, plaintiffs' motion for reconsideration is granted, and the court's December 31, 2003, opinion shall be modified to reflect that the appropriate rate of interest to be applied to plaintiffs' award of just compensation is the compound-

ed annual returns achieved by their state-sanctioned investment funds as set forth in footnote 2, above.

On or before September 15, 2004, the parties shall file a status report setting forth the total amount due plaintiffs consistent with this order.